ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE APELACIONES
PANEL XII

| UNI-GOLD DEVELOPMENT CORP.<br><br>Apelante<br><br>v.<br><br>AUTORIDAD DE ACUEDUCTOS Y ALCANTARILLADOS Y OTROS<br><br>Apelados | TA2025AP00378 | *Apelación* procedente del Tribunal de Primera Instancia, Sala Superior de Caguas<br><br>Caso Núm.: CG2024CV03526<br><br>Sobre: Mandamus |
|---|---|---|

Panel integrado por su presidente, el Juez Candelaria Rosa, el Juez Adames Soto, el Juez Campos Pérez y la Jueza Trigo Ferraiuoli

Campos Pérez, Juez Ponente

**SENTENCIA**

En San Juan, Puerto Rico, a 9 de diciembre de 2025.

Comparece Uni-Gold Development Corp. (en adelante, Uni-Gold o Apelante) y nos solicita nuestra intervención para revocar la *Sentencia* emitida el 15 de abril de 2025, notificada el día siguiente, por el Tribunal de Primera Instancia, Sala Superior de Caguas (en adelante, TPI). En el referido dictamen, el TPI declaró Ha Lugar la *Moción de Sentencia Sumaria* que presentó la Autoridad de Acueductos y Alcantarillados (en adelante, AAA o Apelado) y Ha Lugar la *Petición de Sentencia Sumaria* que sometió la Oficina de Gerencia de Permisos (en adelante, OGPe). En consecuencia, desestimó la demanda de *mandamus* que presentó Uni-Gold.

Por los fundamentos que expondremos a continuación, anticipamos la confirmación de la *Sentencia* apelada.

**I.**

El 23 de septiembre de 2024, Uni-Gold presentó una *Demanda Jurada de Mandamus* en contra de la AAA y OGPe por hechos relacionados a unos endosos necesarios para conectar los servicios de agua potable y alcantarillado sanitario en el proyecto Colinas de Cayey. Alega que la AAA incumplió con su deber ministerial de aprobar y

recomendar los planos revisados, de manera que el proyecto de vivienda reciba los servicios solicitados. En consecuencia, solicitó que se le ordenara a la AAA a llevar a cabo la conexión de agua de las viviendas del proyecto Colinas de Cayey o, en su defecto, se ordenara a la AAA y OGPe cumplir con su deber ministerial de autorizar favorablemente el plano de construcción final del proyecto, para que se conectaran los servicios esenciales que provee la AAA.[1]

Después de varios trámites procesales, Uni-Gold presentó una petición para que el *mandamus* solicitado se tramitara de forma perentoria.[2] La AAA y la OGPe se opusieron a la pretensión del Apelante.

En su escrito, la AAA expuso que el proceso de inspección y aprobación de unidades de vivienda y de la infraestructura de agua potable y el alcantarillado sanitario no constituye un deber ministerial de actuar que no admita discreción en su ejercicio.[3]

Por su parte, la OGPe argumentó que la petición de Uni-Gold no procede en derecho, pues el caso no reúne los requisitos para que se emita el recurso solicitado de manera perentoria. Expuso, además, que Uni-Gold incumplió con la reglamentación aplicable a las enmiendas a un plano de construcción, por lo que no tiene un plazo de tiempo mínimo para emitir su aprobación.[4]

En desacuerdo, Uni-Gold solicitó replicar a las mociones sometidas por los Apelados de manera conjunta.[5] Mediante *Orden* emitida 20 de noviembre de 2024, el TPI le concedió lo solicitado al Apelante.[6]

Así las cosas, el 2 de diciembre de 2024, la AAA presentó una *Moción de Sentencia Sumaria* en la que solicitó la desestimación de la

---

[1] Apéndice del Apelante, entrada 1 del Sistema Unificado de Manejo y Administración de Casos (SUMAC).
[2] *Id.*, entrada 7 de SUMAC.
[3] *Id.*, entrada 13 de SUMAC.
[4] *Id.*, entrada 15 de SUMAC.
[5] Apéndice del Apelante, entrada 16 de SUMAC.
[6] *Id.*, entrada 17 de SUMAC.

demanda de *mandamus*.[7] Expuso que la recomendación y endosos de los planos que ejecuta la agencia son de carácter discrecional, según se desprende de la Ley Núm. 7 del 19 de julio de 1985, según enmendada, conocida como la *Ley para la Certificación de Planos Finales de Construcción que Requieran Permisos y Endosos de Varias Agencias*, 23 LPRA sec. 73 *et seq.*, (en adelante, Ley Núm. 7) y del Reglamento para la Certificación de Planos y Proyectos de Construcción. Por ello, entiende que lo exigido por Uni-Gold no constituye un acto ministerial. A su vez expuso, que Uni-Gold no cumplió con el requerimiento previo antes de presentar su petición de *mandamus*. Por último, sostuvo que el retraso se debe a que Uni-Gold enmendó los planos de construcción sin el consentimiento previo de la agencia e incumplió de manera reiterada con las correcciones que esta le ha señalado.

El mismo día, la OGPe presentó su *Petición de Sentencia Sumaria*.[8] Entre otros asuntos, reiteró que Uni-Gold no cumplió con los requisitos para solicitar un recurso de *mandamus*, puesto que el acto que solicita se ejecute no es de carácter ministerial. Asimismo, adujo que Uni-Gold no hizo alegaciones afirmativas en su contra, por lo que procede la desestimación del recurso en su contra.

Tras varias incidencias procesales, Uni-Gold presentó su *Oposición a Moción de Sentencia Sumaria y a Petición de Sentencia Sumaria*, en la que manifestó que lleva más de seiscientos cincuenta (650) días a la espera de que la AAA y la OGPe aprueben los planos revisados y que se emitan los respectivos endosos y recomendaciones solicitados.[9] Expuso, que contrario a lo alegado por los Apelados, el deber de aprobar, endosar y recomendar los planos es de carácter ministerial. También, asegura que los Apelados no lograron demostrar que no existe una controversia sustancial de hechos, ya que sus conclusiones y opiniones carecen de

---

[7] *Id.*, entrada 21 de SUMAC.
[8] *Id.*, entrada 22 de SUMAC.
[9] *Id.*, entrada 33 de SUMAC.

valor probatorio. Por último, aseguró que cumplió con corregir los señalamientos de la AAA y OGPe, para la aprobación de los planos desde febrero de 2023, y que la AAA señaló las faltas para dilatar el proceso de aprobación.

La AAA sometió su *Réplica a Oposición a Moción de Sentencia Sumaria*,[10] y Uni-Gold presentó una *Dúplica a "Replica a Oposición a Moción de Sentencia Sumaria"*.[11] Una vez examinados los escritos de las partes junto a la prueba documental, el TPI determinó como incontrovertidos los siguientes hechos materiales:

### HECHOS MATERIALES QUE NO ESTÁN EN CONTROVERSIA[12]

1. La parte demandante, Uni-Gold Development Corporation, es la desarrolladora del proyecto Urbanización Colinas de Cayey en la Carretera Estatal PR-171.
2. El referido proyecto se codificó en la Autoridad bajo el número: AAA-RE-13-18-0023 Cayey - Urbanización Colinas de Cayey (48 unidades equivalentes).
3. El 6 de julio de 2016 la Autoridad emitió la aprobación condicionada de los planos de construcción para los sistemas de agua y alcantarillado sanitario del proyecto.[13]
4. La aprobación establece las condiciones aplicables para el sistema de distribución de agua, sistema de alcantarillado sanitario, las condiciones generales y las condiciones adicionales, entre otras.[14]
5. Las condiciones 20 y 21, Exhibit A Condiciones Adicionales, de la carta de aprobación condicionada de planos de construcción establece lo siguiente sobre cambios al plano:

#### Condición 20
Se deberá presentar un plano revisado donde se indique cualquier cambio al sistema de agua y sanitario. Estos cambios al plano inicialmente aprobado deberán ser aprobado antes de proceder con los mismos. Toda solicitud para enmienda de un plano aprobado deberá incluir: un memorial explicativo discutiendo los cambios, los formularios AAA-1294

---

[10] *Id.*, entrada 34 de SUMAC.
[11] *Id.*, entrada 37 de SUMAC.
[12] La parte demandante alega en su *Moción en Oposición* a *Moción de Sentencia Sumaria y a Petición de Sentencia Sumaria* que los hechos no controvertidos del 3 al 16 de la solicitud de sentencia sumaria de la AAA son inmateriales por preceder a los hechos que entiende la demandante son los que motivan su petición de Mandamus. Sostiene el mismo argumento para los hechos no controvertidos del 2 al 10 que establece la OGPe en su solicitud de sentencia sumaria. Somos de la opinión de que estos hechos son pertinentes para la resolución del asunto ante nuestra consideración debido a que las leyes y reglamentos aplicables a esta controversia invitan a observar la totalidad del proceso para establecer si se está en cumplimiento de sus disposiciones. *Véase* Oposición a Moción de Sentencia Sumaria y a Petición de Sentencia Sumaria, Entrada 33, Página 4. Véase, además, Ley para la Certificación de Planos Finales de Construcción que Requieran Permisos y Endosos de Varias Agencias, Ley Núm. 7 del 19 de julio de 1985, Art. 6 (23 L.P.R.A. § 73e). Véase, también, Reglamento para la Certificación de Planos De Construcción, supra, Sec. 3.06, pág.11. Véase además Reglamento para la Certificación de Planos De Construcción, supra, Sec. 7.04 pág.19.
[13] Moción De Sentencia Sumaria, Entrada 21, Anejo 1, Página 1.
[14] Moción De Sentencia Sumaria, Entrada 21, Anejo 1, Página 1-13.

(Certificación del Diseñador) y AAA-972 (Solicitud de aprobación de planos de construcción)

**Condición 21**

Cualquier cambio/enmienda al plano originalmente aprobado deberá ser presentado a través de una petición de servicio para tales fines a través de la Oficina de Gerencia de Permisos (OGPe).[15]

6. El 12 de junio de 2017 se efectuó la reunión pre-construcción del proyecto con la asistencia de representantes de la parte demandante y de la Oficina de Proyectos Públicos y Privados de la Autoridad (PPP).[16]

7. El 28 de junio de 2018 la Autoridad emitió la Aprobación de Planos Revisados para dos cambios: (a) autorización de un punto alterno de conexión al sistema de agua potable y (b) la instalación de una válvula tipo reguladora/sostenedora de presiones.[17]

8. El 26 de febrero de 2019, la Ing. Gina Carrillo García P.E., Gerente Técnico de Proyectos Públicos y Privados de la AAA cursó un correo electrónico a los oficiales de la parte demandante en el cual, entre otras cosas, establece la instalación de una tubería en el proyecto de referencia sin cumplir con los debidos procesos reglamentarios. Además, en dicho correo se consignan otros incumplimientos como la falta de planos aprobados; la no presentación de reportes de inspección donde se certificará que la infraestructura había sido instalada en cumplimiento con los reglamentos y requisitos de la AAA; que la infraestructura instalada tampoco fue validada por el personal de la AAA. Finalmente, consigna un relato de incumplimientos reglamentarios de la entidad demandante desde el año 2017.[18]

9. El 28 de febrero de 2019 la Autoridad inspeccionó el proyecto y determinó que la instalación de la tubería matriz de agua en la Calle 1 no se realizó conforme al plano aprobado, entre otras deficiencias.[19]

10. El 15 de marzo de 2019 la Autoridad envió una comunicación a la parte demandante y le informó las siguientes deficiencias surgidas en la inspección del 28 de febrero de 2019:
    a. La infraestructura del proyecto fue instalada sin ser validada por personal de la Oficina de PPP.
    b. La tubería en la Calle 1 no está instalada según los planos aprobados.
    c. En la visita se identificó acometida en "Viega", esto contrario a las Normas de Diseño y contrario a lo indicado en los planos aprobados con fecha de 6 de julio de 2016 y del 28 de junio de 2018.
    d. La válvula de control para la Calle 5 quedó sobre la tubería sanitaria que discurre para la Calle 6.

11. En la referida comunicación también se le informó al desarrollador, entre otras cosas, lo siguiente:
    a. En la reunión pre-construcción se indicó que se instalaría una nueva tubería, ya que en la investigación de 10 de mayo de 2017 se identificó infraestructura de agua alineada en dirección al tendido eléctrico.
    b. No es hasta la solicitud de inspección que se informó que se utilizaría la infraestructura instalada en el área del proyecto que no cuenta con la autorización de esta agencia.

---

[15] Moción De Sentencia Sumaria, Entrada 21, Anejo 1, página 7.
[16] Moción De Sentencia Sumaria, Entrada 21, Anejo 2.
[17] Moción De Sentencia Sumaria, Entrada 21, Anejo 3.
[18] Petición De Sentencia Sumaria, Entrada 22, Anejo 1, página 1.
[19] Moción De Sentencia Sumaria, Entrada 21, Anejo 4.

c. Se le hizo referencia a la condición 17 de la carta de aprobación de planos que establece que se deberá realizar una excavación exploratoria según lo solicite el inspector de la AAA para poder verificar la profundidad y materiales de tubería.

d. Se le informó que para validar la infraestructura instalada será necesario hacer las catas indicadas por el inspector del proyecto, eliminar las acometidas en "viega" e instalar las acometidas en cobre para que estén de acuerdo con las Normas de Diseño de la Autoridad.[20]

12. El 17 de abril de 2019 se inspeccionó el proyecto y se encontró que no se instaló el MH-20 que se especifica en los planos, que esa modificación no fue consultada con la Autoridad, que la referida alteración provocó la congestión del MH-13 y que se requiere la presentación de un plano "as build" ya que hay grandes discrepancias entre lo establecido en el plano y lo construido en el proyecto.[21]

13. El 18 de junio de 2019 se realizó otra inspección y se encontró, entre otras deficiencias, que se instaló la válvula sin la aprobación del equipo, que nuevamente alteraron el sistema sanitario a la altura de la Calle 6 y la Calle 4 sin consulta previa, por lo que se requiere la presentación del plano "as build" antes de que se pretenda inspeccionar tales tramos.[22]

14. El 1 de julio de 2019 la Autoridad envió una comunicación al desarrollador para informarle, una vez más, que surgía de las inspecciones que la infraestructura instalada no guarda relación con el plano aprobado y le apercibió que para solicitar futuras inspecciones deberá presentar el plano revisado donde se incluyan los cambios, ya que no se continuará validando infraestructura que no ha sido consultada o aprobada previamente.[23]

15. Además, se informó entre otras, las siguientes deficiencias detectadas en la inspección del 18 de junio de 2019:
a. La infraestructura instalada en el proyecto no concuerda con el diseño aprobado con fecha de 28 de junio de 2018 y fue instalada sin ser validada o autorizada por personal de la Oficina de PPP, por lo que la Autoridad se reserva el derecho de aceptar obras que no cumplan con las normas de diseño o cuenten con la aprobación previa.

b. Deberá presentar plano enmendado para incluir cambios en el proyecto.

c. La Autoridad se reserva el derecho de validar y/o aceptar todo equipo instalado en el área del proyecto sin previa autorización y será responsabilidad del dueño del proyecto reemplazar cualquier equipo que haya sido instalado sin la autorización previa.

d. Se identificó un registro sanitario instalado fuera de área de uso público, instalado en un solar, por lo que deberá ser instalado en área de uso público.[24]

16. El 14 de julio de 2022, Uni-Gold, por conducto de su profesional Carlos R. Oquendo P.E. y alegadamente habiendo cumplido con lo requerido por la AAA, presentó los planos de construcción revisados para la debida aprobación de dicha agencia.[25]

17. El 15 de septiembre de 2022, la AAA emitió una misiva al secretario Auxiliar de la OGPe relacionada a la solicitud de

---

[20] Moción De Sentencia Sumaria, Entrada 21, Anejo 5 página 1-2.
[21] Moción De Sentencia Sumaria, Entrada 21, Anejo 6.
[22] Moción De Sentencia Sumaria, Entrada 21, Anejo 7.
[23] Moción De Sentencia Sumaria, Entrada 21, Anejo 8 Página 1.
[24] Moción De Sentencia Sumaria, Entrada 21, Anejo 8 Página 2.
[25] Petición De Sentencia Sumaria, Entrada 22, Anejo 5.

aprobación de planos revisados del proyecto objeto de pleito. En la misma, la AAA indicó que, para poder proceder con la evaluación, Uni-Gold debía someter un memorial firmado y ponchado, indicando todos los cambios en la distribución de los solares que haya sido cambiado del plano aprobado, vigente con fecha de 6 de julio de 2016. El memorando debía incluir la siguiente información: solares eliminados; solares añadidos; cambios en los números de los solares; de haber cambios en la infraestructura para servir la nueva redistribución, debía detallar dichos cambios; debido a que la parte del plano que indica futuro desarrollo no sería evaluada bajo el número que tenía el proyecto (RE-13-18-0023), Uni-Gold debía aclarar el número de unidades equivalentes de esta fase.[26]

18. Además, la AAA le requirió a Uni-Gold que debía someter una carta fechada, firmada y sellada, con la respuesta de cada uno de los comentarios y/o solicitud de información adicional incluidos en esta subsanación, indicando cómo fueron atendidos.[27]

19. El 26 de septiembre de 2022 la parte demandante, en respuesta a una solicitud de información de la Autoridad, informó que no se eliminó ningún solar, no se añadió ningún solar, no se realizaron cambios en los números de los solares y no hubo cambio alguno a la infraestructura sanitaria y potable.[28]

20. El 17 de enero de 2023 la Autoridad informó que para evaluar la solicitud de aprobación de planos revisados deberá someter un memorial firmado y ponchado indicando los cambios en la distribución de solares en comparación con el plano aprobado de julio de 2016 e incluir lo siguiente:

   a. Solares eliminados
   b. Solares añadidos
   c. Cambios en los números de solares
   d. De haber cambios en la infraestructura para servir la nueva redistribución los cambios deberán ser detallados
   e. La parte del plano que indica futuro desarrollo no será evaluada bajo este número de proyecto. Por tal razón, deberá aclarar el número de unidades equivalentes de esta fase.[29]

21. Mediante comunicación de 2 de febrero de 2023 el ingeniero designado por el desarrollador contestó la comunicación de la Autoridad e informó, contrario a su comunicación de 26 de septiembre de 2022, lo siguiente:
    - Solares eliminados: 3 en la Calle 5
    - Solares añadidos: 2 en la Calle 1; 1 solar en la Calle 4
    - Cambio en los números de solares: hubo cambios en las Calles 1, 3, 4, 5 y 6; no hubo cambios en la Calle 2
    - Cambios en la infraestructura: no existe cambio en el diseño de la infraestructura matriz sanitaria y agua potable. Por la topografía y su complejidad, se ajustó la geometría del proyecto en algunos solares.
    - Futuro desarrollo: El plano *as built* presentado es para los solares 1 al 33; solares 34 al 47 se presentaría en otro plano.[30]

---

[26] Petición De Sentencia Sumaria, Entrada 22, Anejo 6.
[27] *Id.*
[28] Moción De Sentencia Sumaria, Entrada 21, Anejo 9.
[29] Demanda Jurada de *Mandamus*, Entrada 1, Anejo 1.
[30] Moción De Sentencia Sumaria, Entrada 21, Anejo 10.

22. El 8 de febrero de 2023 la Autoridad emitió el endoso para permiso de uso de las unidades 1 y 2 en la Calle 2 donde no hubo cambios.[31]

23. El 18 de abril de 2023 la parte demandante solicitó el endoso de los solares 13 al 16.[32]

24. El 1 de junio de 2023, la AAA emitió otra misiva al Secretario Auxiliar de la OGPe relacionada a la solicitud de aprobación de planos revisados del proyecto de referencia. En la misma, la AAA expuso que los planos de construcción revisados no habían sido aprobados debido a unos señalamientos realizados por personal técnico de su Oficina de Proyectos Públicos y Privados, los cuales debían ser atendidos, clarificados y/o corregidos, según correspondiera. En síntesis, estos señalamientos versaban sobre incumplimientos con el Reglamento de Normas de Diseño de la Autoridad de Acueductos y Alcantarillados, Reglamento Núm. 3149 de 13 de septiembre de 1984, y registros de inspección instalados en el área de la acera que tenían que ser relocalizados al área de rodaje. Además, la AAA le requirió que actualizaran las tablas de revisiones en cada hoja del set de planos, y que verificaran y tomaran acción sobre todos y cada uno de los comentarios que habían marcado en color rojo en el plano revisado sometido para aprobación por Uni-Gold.[33]

25. Además, la AAA le requirió a Uni-Gold que una vez atendiera los señalamientos, debía someter los planos nuevamente para evaluación. Junto con los planos revisados, Uni-Gold debía someter una carta en respuesta a cada uno de los señalamientos, indicando cómo fueron atendidos. Asimismo, la demandante debía incluir en la carta cualquier otro cambio realizado en los planos. Finalmente, la AAA le apercibió a Uni-Gold que, de no incluir dicha carta con los planos revisados, los mismos podrán ser devueltos sin ser evaluados.[34]

26. El 12 de junio de 2023, la parte demandante notificó una misiva en respuesta al requerimiento de subsanación cursado por la AAA el 1 de junio de 2023. En cuanto al primer señalamiento, Uni-Gold expuso que no había que relocalizar los registros sanitarios, toda vez que lo que no permitía el Reglamento de Normas de Diseño era la instalación de dichos registros en solares privados y que aun así permitía excepciones. Además, expuso que el citado reglamento permitía la instalación de estos en servidumbres públicas. En cuanto al segundo señalamiento, la demandante expuso que los registros sanitarios identificados por la AAA no se encontraban en el área de la acera, sino en el área designada para la calle e incluyó fotografías como evidencia.[35]

27. El 29 de septiembre de 2023, la AAA emitió otra misiva al Secretario Auxiliar de la OGPe relacionada a la solicitud de aprobación de planos revisados del proyecto de referencia. En la misma, indicó que el Reglamento de Normas de Diseño no permite la construcción de registro de inspección en terrenos y/o solares privados, y que las excepciones a esta regla solo surgen cuando no exista otra alternativa, lo que no ocurría en este caso. Así las cosas, la AAA reiteró su requerimiento de subsanación. En cuanto al segundo señalamiento, la AAA expuso que se encontraba en la etapa de evaluación de planos y que, según el plano presentado, los registros aparenten estar en la acera. Debido a ello, le requirió a la demandante someter una carta fechada, firmada y sellada, con la

---

[31] Moción De Sentencia Sumaria, Entrada 21, Anejo 11.

[32] Demanda Jurada de *Mandamus*, Entrada 1, Anejo 4.

[33] Petición De Sentencia Sumaria, Entrada 22, Anejo13. Véase Demanda Jurada de *Mandamus*, Entrada 1, Anejo 5. Véase, además, Demanda Jurada de *Mandamus,* Entrada 1, Alegación 15.

[34] *Id* en la página 2.

[35] Petición De Sentencia Sumaria, Entrada 22, Anejo10.

respuesta de cada uno de los comentarios y/o solicitud de información adicional, incluidos en esta subsanación indicando cómo fueron atendidos.[36]

28. El 24 de junio de 2024, la parte demandante notificó una misiva en respuesta al requerimiento de subsanación cursado por la AAA el 29 de septiembre de 2023. Mediante esta, Uni-Gold reconoció que en el plano sometido los registros parecían estar ubicados en una servidumbre pública o solar privado. Debido a ello, sometió un nuevo plano de construcción en el cual corrigió gráficamente la ubicación del registro. En cuanto al segundo señalamiento, Uni-Gold se reiteró en que los registros sanitarios no estaban localizados en el área de la acera y que los mismos se encontraban en el área designada para la calle.[37]

29. El 17 de octubre de 2024, el Ing. Augusto Ortiz Mercado, Director Auxiliar Senior de Proyectos Públicos y Privados de la AAA, emitió una misiva al Secretario Auxiliar de la OGPe relacionada a la solicitud de aprobación de planos revisados del proyecto de referencia. En la misma, el Ing. Ortiz estableció que la comunicación de Uni-Gold del 24 de junio de 2024 no cumplía con los requerimientos de subsanación que la agencia había cursado. Específicamente, la carta indica que, aun cuando Uni-Gold explica que los registros no están en solar privado, el plano revisado sometido muestra que los mismos quedan fuera de la calle y fuera de los solares 13 y 14 propuestos.[38]

30. La carta del 17 de octubre de 2024 consigna que los solares propuestos cambiaron de geometría haciendo que el solar 13 en la Calle 1 y el solar 21 en la Calle 3 no tengan línea sanitaria al frente y provocando que la descarga sanitaria tenga que cruzar en diagonal para llegar al registro más cercano por el frente del solar vecino, según se observa en el plano sometido. Además, consigna que hay otros cambios en el plano sometido que no se incluyeron en el memorial de Uni-Gold de 24 de junio de 2024.[39]

31. Finalmente, la AAA le volvió a requerir a la demandante que incluyera en el memorial todos los cambios realizados al plano, incluyendo notas que indiquen si las unidades son existentes o propuestas, para proceder a evaluarlos. Asimismo, la AAA requirió que se sometiera una carta memorial fechada, firmada y sellada que explicara los cambios incluidos al plano aprobado y que consignara la respuesta a cada uno de los señalamientos y/o solicitud de información adicional incluidos en dicha comunicación, indicando cómo fueron atendidos. Además, Uni-Gold tenía que incluir en el memorial todos los cambios sanitarios y potables realizados.[40]

En consideración a lo anterior, el tribunal apelado concluyó que Uni-Gold no cumplió con los requisitos que exige nuestro ordenamiento civil para expedir un recurso de *mandamus*. En primer lugar, determinó que Uni-Gold incumplió con el requisito de requerimiento previo que

---

[36] Petición De Sentencia Sumaria, Entrada 22, Anejo10. Véase Demanda Jurada de *Mandamus*, Entrada 1, Anejo 7. Véase, además, Demanda Jurada de *Mandamus*, Entrada 1, Alegación 17.

[37] Petición De Sentencia Sumaria, Entrada 22, Anejo13.

[38] Petición De Sentencia Sumaria, Entrada 22, Anejo14, en la página 1.

[39] *Id.*

[40] *Id* en la página 2.

debe existir antes de presentar un recurso de *mandamus*. Segundo, adjudicó que la acción solicitada no es de carácter ministerial, pues la ley le provee discreción a la AAA para emitir los endosos solicitados. Así pues, ante la inexistencia de controversia en cuanto a que el deber solicitado no es de carácter ministerial y el incumplimiento con el requisito de requerimiento previo, el TPI declaró Ha Lugar las solicitudes de sentencia sumaria presentadas por los Apelados y desestimó la acción de *mandamus* sometida por Uni-Gold.

En desacuerdo, el 1 de mayo de 2025, Uni-Gold presentó una *Solicitud de Reconsideración* que el TPI denegó, mediante *Resolución Interlocutoria* emitida el 27 de agosto de 2025.

Inconforme con lo resuelto, Uni-Gold acudió ante este foro intermedio mediante el recurso de epígrafe en el que señaló la comisión de los siguientes cuatro errores:

> PRIMER ERROR:
> *ERRÓ EL TRIBUNAL DE PRIMERA INSTANCIA AL DICTAR SENTENCIA SUMARIA PUES EXISTEN CONTROVERSIAS DE HECHOS MATERIALES QUE EXIGEN QUE EL CASO SE VENTILE EN SUS MÉRITOS.*
>
> SEGUNDO ERROR:
> *ERRÓ EL TRIBUNAL DE PRIMERA INSTANCIA AL CONSIDERAR HECHOS QUE NO SON MATERIALES A LA CONTROVERSIA AL DICTAR SENTENCIA SUMARIA.*
>
> TERCER ERROR:
> *ERRÓ EL TRIBUNAL DE PRIMERA INSTANCIA AL NO CELEBRAR UNA VISTA EVIDENCIARIA CONFORME A DERECHO ANTES DE EMITIR LA SENTENCIA.*
>
> CUARTO ERROR:
> *ERRÓ EL TRIBUNAL DE PRIMERA INSTANCIA AL NO EMITIR EL MANDAMUS PUES SE CUMPLEN CON LOS REQUISITOS EXIGIDOS POR LEY.*

## II.

### A.

La Regla 36 de Procedimiento Civil, 32 LPRA Ap. V., R.36, gobierna el mecanismo de la sentencia dictada sumariamente. Esta herramienta procesal sirve al propósito de aligerar la conclusión de los pleitos, sin la celebración de un juicio en sus méritos, siempre y cuando no exista una legítima controversia de hechos medulares, de modo que lo restante sea

aplicar el derecho. Véase, *Jusino et als. v. Walgreens,* 155 DPR 560, 576 (2001); *Roldán Flores v. M. Cuebas et al.,* 199 DPR 664, 676 (2018); *Meléndez González et al. v. M. Cuebas,* 193 DPR 100, 109 (2015). Así se propende a la solución justa, rápida y económica de los litigios de naturaleza civil en los cuales no exista una controversia genuina de hechos materiales. *Pérez Vargas v. Office Depot,* 203 DPR 687, 699 (2019). En este sentido, un hecho material "es aquel que puede afectar el resultado de la reclamación de acuerdo con el derecho sustantivo aplicable". *Meléndez González et al. v. M. Cuebas, supra,* pág. 110. Por ello, "[l]a controversia debe ser de una calidad suficiente como para que sea necesario que un juez la dirima a través de un juicio plenario". *Ramos Pérez v. Univisión,* 178 DPR 200, 213 (2010).

La Regla 36.2 del mismo ordenamiento procesal, establece que la parte contra la cual se haya formulado una reclamación podrá presentar "una moción fundada en declaraciones juradas o en aquella evidencia que demuestre la inexistencia de una controversia sustancial de hechos esenciales y pertinentes, para que el tribunal dicte sentencia sumariamente a su favor sobre la totalidad o cualquier parte de la reclamación". 32 LPRA Ap. V, R. 36.2. Por su lado, conforme la Regla 36.3 de Procedimiento Civil, *supra,* en su contestación, la parte promovida "no podrá descansar solamente en las aseveraciones o negaciones contenidas en sus alegaciones, sino que estará obligada a contestar en forma tan detallada y específica, como lo haya hecho la parte promovente. De no hacerlo así, se dictará la sentencia sumaria en su contra si procede". 32 LPRA Ap. V, R. 36.3 (c). Asimismo, la Regla 36.3 de Procedimiento Civil, *supra,* establece unos requisitos de forma a ser cumplidos por la parte promovente y la parte promovida. 32 LPRA Ap. V, R. 36.3; Véase, *Pérez Vargas v. Office Depot, supra,* pág. 698. Por consiguiente, el incumplimiento del promovente de estas formalidades acarrea que el tribunal no esté obligado a considerar su pedimento. *Meléndez González et al. v. M. Cuebas, supra,* pág. 111. En caso de que

el promovido sea quien incumple dichos requisitos "el tribunal puede dictar Sentencia Sumaria a favor de la parte promovente, si procede en derecho". *Id.*

En cuanto a la revisión de un dictamen sumario o la denegación de la resolución abreviada, este tribunal revisor se encuentra en la misma posición que el foro de primera instancia al determinar si procede o no una sentencia sumaria. Sin embargo, al revisar la determinación del tribunal primario, estamos limitados de dos maneras: (1) sólo podemos considerar los documentos que se presentaron ante el foro de primera instancia; y (2) sólo podemos determinar si existe o no alguna controversia genuina de hechos materiales y esenciales, así como si el derecho se aplicó de forma correcta. Esto es, no estamos compelidos a adjudicar los hechos materiales esenciales en disputa. *Vera v. Dr. Bravo*, 161 DPR 308, 334-335 (2004). El deber de adjudicar hechos materiales y esenciales es una tarea que le compete al Tribunal de Primera Instancia y no al foro intermedio.

A esos efectos, el Tribunal Supremo de Puerto Rico estableció el estándar específico que debemos utilizar como tribunal revisor al momento de evaluar determinaciones del foro primario en las que se conceden o deniegan mociones de sentencia sumaria. En lo pertinente, dispuso que "[l]a revisión del Tribunal de Apelaciones es una de *novo* y debe examinar el expediente de la manera más favorable a favor de la parte que se opuso a la Moción de Sentencia Sumaria en el foro primario, llevando a cabo todas las inferencias permisibles a su favor". *Meléndez González et al. v. M. Cuebas*, *supra*, pág. 118. Además, reiteró que por estar en la misma posición que el foro primario, debemos revisar que tanto la moción de sentencia sumaria como su oposición cumplan con los requisitos de forma recopilados en la Regla 36 de Procedimiento Civil. *Id.*

Por lo cual, luego que culminemos nuestra revisión del expediente, de encontrar que en realidad existen hechos materiales y esenciales en

controversia, debemos tener en cuenta el cumplimiento de la Regla 36.4 de Procedimiento Civil y exponer concretamente cuáles hechos materiales están controvertidos y cuáles están incontrovertidos. Por el contrario, de resultar que los hechos materiales y esenciales realmente están incontrovertidos, entonces nos corresponde revisar *de novo* si el foro impugnado aplicó correctamente el derecho a los hechos incontrovertidos. *Id.*, pág. 119.

Al dictar una sentencia sumaria, este tribunal deberá realizar un análisis dual que consiste en: (1) analizar los documentos que acompañan la solicitud de sentencia sumaria y los que se incluyen con la moción en oposición, así como aquellos que obren en el expediente del tribunal; y (2) determinar si el oponente de la moción controvirtió algún hecho material y esencial, o si hay alegaciones de la demanda que no han sido controvertidas o refutadas en forma alguna por los documentos. *Vera v. Dr. Bravo*, *supra*, pág. 333. Una vez realizado este análisis el tribunal no dictará sentencia sumaria cuando: (1) existen hechos materiales y esenciales controvertidos; (2) hay alegaciones afirmativas en la demanda que no han sido refutadas; (3) surge de los propios documentos que se acompañan con la moción una controversia real sobre algún hecho material y esencial; o (4) como cuestión de derecho no procede. *Id.*, págs. 333-334.

**B.**

El auto de *mandamus* es un recurso extraordinario, altamente privilegiado y discrecional. Se expide para ordenar a cualquier persona natural, corporación o a un tribunal de inferior jerarquía que cumpla o ejecute un acto que forma parte de sus deberes y atribuciones. Artículo 649 del Código de Enjuiciamiento Civil, 32 LPRA sec. 3421; *Kilómetro 0 v. Pesquera López et al.*, 207 DPR 200, 214 (2021).

Aunque el *mandamus* es un remedio en ley, participa de la índole de los de equidad. *AMPR v. Srio. Educación, E.L.A.*, 178 DPR 253, 264, (2010). Solamente procede para exigir el cumplimiento de un deber

impuesto por la ley, calificado de "ministerial". Por tanto, no admite discreción en su ejercicio. En cambio, es mandatorio e imperativo. *Espina v. Calderón, Juez, Sucn. Espina, Int.*, 75 DPR 76, 84 (1953); *Álvarez de Choudens v. Tribunal Superior*, 103 DPR 235, 242 (1975).

La petición de *mandamus* debe evaluarse a la luz de diversos requerimientos, entiéndase: (1) que el demandado tenga un deber u obligación ministerial impuesto por ley; (2) que el peticionario tenga un interés especial en el derecho que reclama; (3) que el deber de actuar de la agencia y el derecho del peticionario surjan de la ley de forma clara y patente; (4) que el peticionario no tiene otro remedio legal para hacer valer su derecho; y (5) que, estimado el efecto que tendrá la expedición del auto, el Tribunal entienda que los fines de la justicia obligan a su expedición. Véase, Artículos 649-651 del Código de Enjuiciamiento Civil, *supra.*

Para que proceda, el peticionario debe demostrar que hizo un requerimiento previo hacia el demandado para que cumpliera con el acto exigido. *AMPR v. Srio. Educación, E.L.A.*, supra, pág. 31. En particular:

> ...deb[e] alegarse en la petición, tanto el requerimiento como la negativa, o la omisión del funcionario en darle curso. Sólo se exime de este requisito: 1) cuando aparece que el requerimiento hubiese sido inútil e infructuoso, pues hubiese sido denegado si se hubiera hecho; o 2) cuando el *deber* que se pretende exigir es uno de *carácter público*, a diferencia de uno de naturaleza particular, que afecta solamente el derecho del peticionario. *Id.*, pág. 32.

El Tribunal Supremo ha aclarado que el deber invocado en el *mandamus* no necesariamente tiene que surgir expresamente de un estatuto, pues como tribunales nos corresponde interpretar la ley para determinar la presencia o ausencia del acto ministerial. Es decir, luego de la evaluación estatutaria, los tribunales podemos justipreciar si se intenta "compeler la ejecución de actos ilegales, contrarios a la política pública o tendentes a auxiliar un propósito ilegal", en cuyo caso no procedería el recurso de *mandamus. Noriega v. Hernández Colón*, 135 DPR 406, 456 (1994); *Hernández Agosto v. Romero Barceló*, 112 DPR 407,

412 (1982), citados con aprobación en *Díaz Saldaña v. Acevedo Vilá,* 168 DPR 359, 365 (2006) (Sentencia).

## C.

La Ley Núm. 7 del 19 de julio de 1985, conocida como la Ley para la Certificación de Planos Finales de Construcción que Requieran Permisos y Endosos de Varias Agencias, según enmendada, 23 LPRA sec. 73 *et seq.,* se creó con el propósito de establecer un sistema de certificación[41] de planos finales de construcción, que requieran permisos y endosos de las agencias como la Autoridad de Acueductos y Alcantarillados y la Junta de Calidad Ambiental, necesarios para la expedición de permisos de construcción por parte de la Administración de Reglamentos y Permisos, entre otros. El objetivo es agilizar los trámites de la radicación de planos de construcción de obras y documentos pertinentes que requieran permisos y endosos de las agencias concernidas sin sacrificar la responsabilidad supervisora y reguladora de las agencias públicas "con el interés de expeditar y facilitar los procesos de obtención de endosos y permisos en la construcción de obras". Véase, la Exposición de Motivos.

A esos fines, las agencias "deben establecer procedimientos fiscalizadores que permitan operar efectivamente este mecanismo de certificación y a tales fines se concede autorización suficiente para el cumplimiento de esta encomienda". *Id.*

En su parte pertinente a la controversia ante nuestra consideración, el Artículo 2 del citado estatuto dispone como sigue:

> (a) Reglamento sobre procedimiento de certificación.
> Según establecido en la Ley 161-2009, según enmendada, se incluirá en el Reglamento Conjunto todo lo necesario para establecer y aplicar un sistema de certificación de planos finales y documentos pertinentes para proyectos de construcción de obras que requieran recomendaciones y permisos de construcción, así como todo lo relativo a la inspección y supervisión de obras y a procedimientos para revisar, subsanar

---

[41] La Ley Núm. 7, supra, dispone que la certificación "significará cuando el profesional que diseñó la fase especializada, establece ante la agencia concernida, utilizando el formulario requerido para tales propósitos, que los planos y demás documentos sometidos de manera final, están en conformidad con las leyes, reglamentos y especificaciones establecidas". 23 LPRA sec. 73.

y/o penalizar faltas, errores, incumplimientos o la presentación de información incorrecta o falsa en el proceso de certificación, en los planos o documentos sometidos o en la construcción de la obra objeto de la recomendación, permiso o autorización que se solicite.

El Reglamento Conjunto deberá cubrir el procedimiento necesario para la radicación de planos y documentos certificados con el propósito de obtener permisos y recomendaciones de las Entidades Gubernamentales Concernidas.

En tanto, el Artículo 4, dispone sobre el proceso que debe seguir la agencia pública una vez el ingeniero o arquitecto de la obra someta la certificación. Específicamente, la disposición establece:

Cuando el ingeniero o arquitecto que diseñó la fase especializada someta a la agencia concernida, con el objeto de obtener un endoso o aprobación de construcción, los planos y demás documentos debidamente certificados, la agencia expedirá el correspondiente endoso o autorización basándose, en el cumplimiento de la reglamentación establecida conforme al Artículo 2 de esta ley y en la certificación sometida por el ingeniero o arquitecto, y archivará copia de dicha autorización con los planos y demás documentos sometidos.

La aprobación deberá efectuarse a la mayor brevedad posible y nunca, salvo lo dispuesto en el Artículo 6, su expedición tardará más de cinco (5) días laborables.

A tenor con lo anterior, el Artículo 6 de dicha ley dispone las excepciones que son las siguientes:

(a) En aquellos casos en que al momento de someterse los planos y documentos certificados para aprobación ocurra una de las siguientes causas, la agencia deberá cotejar o revisar los mismos antes de proceder a aprobar la obra.
   (1) Cuando el profesional que certificó ha incurrido previamente en faltas o violaciones a la ley y/o reglamentos aplicables para la certificación de proyectos.
   (2) Cuando el profesional que certificó se encuentra sujeto a un procedimiento administrativo o judicial por alegadas violaciones a esta ley, o a la ley que regula la práctica de su profesión.
(b) En aquellos casos en que la agencia dilate la aprobación por una de las causas expresadas en este artículo, la agencia deberá comunicarle por escrito en o antes de diez (10) días la causa en que fundamenta la dilación de la aprobación.

**III.**

Para Uni-Gold la desestimación sumaria de su petición de *mandamus* es improcedente. Pues, entiende que existen controversias sustanciales sobre los hechos materiales que impiden su disposición de forma sumaria. Sostiene que ni la AAA ni la OGPe cumplieron con su carga de demostrar la inexistencia de controversia de hechos materiales. Además, alude que ambas partes se limitaron a presentar hechos de

periodos anteriores que son inmateriales con relación al *mandamus* instado y que fueron acogidos erróneamente por el TPI. Por último, expone que los hechos enumerados por los Apelados demuestran que sí existe una controversia sobre si Uni-Gold cumplió o no con los requisitos exigidos para la aprobación de planos y emisión de las recomendaciones para la conexión de agua y servicios sanitarios. Finalmente, argumenta que entre los requisitos para expedir un mandamus está la celebración de una vista evidenciaria y que el tribunal primario falló en no celebrarla.

Por el contrario, los Apelados aseguran que no existe controversia de hechos materiales. Afirman que la prueba sometida demuestra que estos cumplieron con su obligación de establecer que no existen controversias de hechos materiales. Empero, sostienen que la oposición que presentó Uni-Gold no logró controvertir los hechos que presentaron en sus respectivas solicitudes de sentencia sumaria, tal y como requiere la Regla 36.3 (b) de Procedimiento Civil, *supra*, y su jurisprudencia. Veamos.

Tras un examen de *novo* de las alegaciones y la prueba contenida en el expediente en autos, resolvemos que tanto la *Moción de Sentencia Sumaria* presentada por la AAA, como la *Petición de Sentencia Sumaria* sometida por la OGPe, cumplen con los requisitos exigidos por la Regla 36.3 (a) de Procedimiento Civil, *supra*. Esencialmente, ambas contienen una exposición breve de las alegaciones de las partes, los asuntos en controversia y una relación concisa y organizada en párrafos enumerados de los hechos sobre los cuales no existe controversia, con indicación de la prueba admisible que los sustenta. A su vez, exponen los argumentos en derecho para que se dicte sentencia sumaria sobre el remedio solicitado.

En cambio, la *Oposición a Moción de Sentencia Sumaria y a Petición de Sentencia Sumaria* que presentó Uni-Gold incumple, a grandes rasgos, con las formas exigidas en la Regla 36.3 (b) de Procedimiento Civil, *supra*. De entrada, esta carece del orden y la forma que requiere la

norma procesal. En dicha moción, hallamos una introducción de los asuntos acaecidos en el litigio y, en la segunda parte, una mención del asunto en controversia. También, falla en desglosar, de forma separada, concisa y organizada, los hechos esenciales que están en controversia y los incontrovertidos. La parte, solamente se limita a aclarar y refutar algunos de los hechos enumerados por los apelados con alegaciones que no se sustentan con la prueba sometida. De modo que, a tenor con el estándar de revisión que dispone la Regla 36 de Procedimiento Civil, *supra*, procede que se den por incontrovertidas las determinaciones de hechos presentadas por los Apelados.

Ahora, nos corresponde determinar si el foro apelado aplicó correctamente el derecho al pleito de epígrafe. Adelantamos que sí lo hizo.

Un examen del marco legal sobre el *mandamus* y las normas esbozadas por las partes nos mueve a concluir que Uni-Gold no logró demostrar que cumple con los requisitos esenciales que exige la ley para la expedición del auto solicitado. Aunque el Apelante asegura que cumplió con todos los requisitos para que el foro apelado emitiera el *mandamus*, la doctrina que cita para establecer dicho deber ministerial no nos convence.

A su entender, los plazos establecidos en el Art. 4 de la Ley Núm. 7; la Sección 9.02 del Reglamento para la Certificación de Planos de Proyectos de Construcción; y la Sección 2.1.9.11 del Reglamento Conjunto de 2023 determinan el deber ministerial que tenían los Apelados para endosar el plano revisado sometido o, en la alternativa, la expedición de la autorización del plano, para que así se ordenara la inmediata conexión de los servicios solicitados.

Sin embargo, al examinar las normas citadas, resulta evidente que la actuación que demanda el Apelante no constituye un deber ministerial que no admita discreción en su ejercicio. Así surge de los artículos de la Ley Núm. 7, *supra*, citados por las partes, que demuestran que se trata

más bien de un acto discrecional y no mandatorio. Específicamente el Artículo 4 de la referida ley dispone que:

Cuando el ingeniero o arquitecto que diseñó la fase especializada someta a la agencia concernida, con el objeto de obtener un endoso o aprobación de construcción, los planos y demás documentos debidamente certificados, **la agencia expedirá el correspondiente endoso o autorización basándose, en el cumplimiento de la reglamentación establecida conforme al Artículo 2 de esta ley** y en la certificación sometida por el ingeniero o arquitecto, y archivará copia de dicha autorización con los planos y demás documentos sometidos.
**La aprobación deberá efectuarse a la mayor brevedad posible y nunca, salvo lo dispuesto en el Artículo 6, su expedición tardará más de cinco (5) días laborables.** (Énfasis suplido). 23 LPRA sec. 73c.

De lo anterior, podemos colegir que este término solo aplica si la parte **cumple** con la reglamentación establecida en el Art. 2 de la ley. En este, se establece un proceso para la certificación de planos finales y documentos pertinentes para proyectos de construcción de obras, y dispone de procedimientos para revisar, subsanar o penalizar faltas o incumplimientos en el proceso de certificación, en los planos, documentos o en la construcción de la obra objeto de la recomendación, permiso o autorización que se solicite. Art. 2 de la Ley Núm. 7, 23 LPRA sec. 73a. Es decir, si no hay ningún incumplimiento, procede la aprobación en el término dispuesto.

Así pues, es claro que el examen y aprobación de un plano revisado no puede ser mandatorio e imperativo, pues la propia ley dispone de un proceso que admite discreción en la evaluación para conceder o no la aprobación final del plano revisado. Ello así, debido a que este está sujeto al cumplimiento de leyes y reglamentos aplicables para la certificación de proyectos. Art. 6 de la Ley Núm. 7, 23 LPRA sec. 73 e.

Por tanto, no existe una obligación en ley para que los Apelados concedan de inmediato la conexión de los servicios de agua potable y alcantarillado sanitario, una vez la parte interesada presenta un plano de construcción. Tampoco existe el deber de expedir la autorización del plano revisado para que se ordene la inmediata conexión de los servicios.

Igualmente, la Sección 9.02 del Reglamento para la Certificación de Planos de Construcción de 31 de enero de 1986, establece un término "de no más de cinco (5) días laborables, luego de radicada ésta (la solicitud para la aprobación de la certificación de un plano de construcción) **siempre que cumpla** con lo establecido en dicho reglamento.

Este Reglamento, creado al amparo de la Ley Núm. 7, *supra*, establece un sistema de certificación de planos finales de construcción que debe regirse por una revisión técnica de las agencias "para determinar si cumplen con los reglamentos y leyes oficiales". Exposición de motivos de la Ley Núm. 7, *supra*. Una vez se verifica este cumplimiento procede la aprobación en el plazo dispuesto.

Una vez más, de la ley y reglamentos que menciona el Apelante, para establecer que los Apelados tenían un deber ministerial, no surge tal obligación. Por el contrario, todos establecen que los endosos y permisos que se soliciten quedan sujetos al cumplimiento de la reglamentación establecida a esos fines. En consecuencia, los Apelados si tienen discreción para conceder o no el endoso o aprobación de planos sujeto al cumplimiento de la ley y reglamentos.

En mérito de lo anterior, concluimos que el tribunal apelado no erró al desestimar sumariamente la demanda de *mandamus* que presentó Uni-Gold, ya que no logró demostrar que los Apelados tenían un deber ministerial de actuar impuesto por ley.

**IV.**

Por los fundamentos que anteceden se confirma la Sentencia apelada.

Lo acordó y manda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones. El Juez Adames Soto disiente con la siguiente expresión:

Varios son los asuntos que me conminan a disentir del curso decisorio seguido por mis respetados compañeros jueces de Panel, pero

solo me limitaré a mencionar aquellos que juzgo de mayor peso. En primer término, las determinaciones de hechos incontrovertidos enumeradas tanto en la Sentencia apelada, (reproducción de las determinaciones de hechos incontrovertidos propuestas por la Oficina de Gerencia y Presupuestos, OGP, en su petición de sentencia sumaria, entrada Núm. 22 de SUMAC), como las acogidas por este Panel, se muestran muy detalladas en las fechas de los procesos en general, salvo cuando correspondía precisar la fecha en que la parte apelante de epígrafe instó su recurso de *mandamus,* que ni siquiera fue mencionado. En lo puntual, habiéndose determinado que, en respuesta a los requerimientos de subsanación pendientes, la parte apelante notificó una misiva a la AAA el 24 de junio de 2024, lo cierto es que no hubo noticias de las agencias llamadas a atender el asunto, sino hasta después de que la parte apelante se viera precisada a presentar el recurso de *mandamus,* el 23 de septiembre de 2024. Desde mi óptica, era preciso incluir en las determinaciones de hechos lo que puntualizo, en tanto ponía de manifiesto el extendido hiato que se permitieron las agencias llamadas a actuar con celeridad, por disposición expresa de ley, para conceder o denegar el permiso pendiente. Lo cierto es que no fue sino hasta el 17 de octubre de 2024 (pasados casi cuatro meses desde la última comunicación de la parte apelante), que los apelados se expresaron de algún modo acerca del permiso que estaba pendiente de aprobación, y ya cuando había intervenido una petición de *mandamus* para que el Tribunal los obligara a ello. Esto me lleva al segundo asunto de importancia. La política pública plasmada en la Ley Núm. 161-2009, según enmendada, *Ley para reformas de permisos de Puerto Rico,* se encuentra salpicada por todas partes de expresiones referentes a la urgente necesidad de que el proceso de permisos en el País se agilice, de manera que pueda servir de *dínamo* a nuestra economía, ante el hecho de que la comunidad mundial lo ha calificado entre los peores del mundo y en retroceso. Lo que históricamente se ha opuesto a la eficiencia en la

aprobación de los permisos ha sido, precisamente, las trabas que imponen las agencias encargadas de la aprobación de los permisos a tal gestión, según la referida Exposición de Motivos detalla, (burocracia gubernamental compleja, excesiva y onerosa la llaman los expertos), siendo precisamente la industria de la construcción la más afectada por ello. A pesar de ello, y de los términos cortos comprendidos en la legislación relativa a la aprobación de los referidos permisos, Artículo 4 del referido estatuto, en la Sentencia apelada se puso el acento en "fiscalización efectiva, real y oportuna" de las agencias que tienen a cargo la aprobación de los permisos, y en el término *discrecional* que promueve la OGP para aprobar el permiso, según su concepción del Artículo 6 de la ley aludida. Es precisamente esa discreción distendida que promueve la parte apelada la que nos ancla en las posiciones últimas de agilidad en aprobación de permisos a nivel mundial, a lo que se une la indecisión judicial de hacer cumplir la voluntad legislativa sobre la celeridad legislativa clamada. Contrario a mis compañeros de Panel, sí advierto un deber ministerial de los apelados en la aprobación del permiso solicitado, además de la conjunción de los requisitos que habilitaban al foro apelado para conceder el *mandamus* solicitado, y por ello respetuosamente disiento.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones